UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

JONATHAN JASON RODRIGUEZ,

                Plaintiff,

    v.

BRAD CAIN, J. BELL, T. JOST, C.
ANDERSON, BANNER, G. KAUTZ, N.
HANSEN, N. MAIN, *and* F. SERRANO,

              Defendants.

Case No. 2:19-cv-00087-AR

**OPINION AND ORDER**

_____

**ARMISTEAD, Magistrate Judge**

      Plaintiff Jonathan Rodriguez, representing himself, brings this section 1983 lawsuit

against nine employees of the Oregon Department of Corrections, alleging that they violated his

constitutional rights while he was in custody at the Snake River Correctional Institution. The

court previously granted summary judgment to defendants on Rodriguez's claims for excessive

force, gross negligence, and his Eighth Amendment claims against defendants Banner, Bell, and

Cain. (Opinion and Order, ECF No. 83.) In his four remaining claims, Rodriguez alleges that

Page 1 – OPINION AND ORDER

(1) defendants Main and Hansen violated his Fourteenth Amendment right to due process when they removed property from his cell to harass him; (2) defendant Serrano violated his Fourteenth Amendment right to due process by refusing to consider video evidence during his disciplinary hearing; (3) defendant Hansen violated his Eighth Amendment right to be free from cruel and unusual punishment by denying him basic medical care; and (4) defendant Jost violated his First Amendment right to free speech by retaliating against him for filing grievances. (Compl. ¶¶ 103-07, ECF No. 2.)

Defendants now ask for summary judgment on Rodriguez's remaining claims because, in their view, his allegations fail to establish constitutional violations. (Defs.' Mot. at 2, ECF No. 90.) According to defendants, removal of Rodriguez's property is not a Fourteenth Amendment violation because the state provides an adequate post-deprivation remedy. Rodriguez's claim against Serrano also fails, they argue, because Serrano was not required to conduct additional investigation at Rodriguez's request or to manufacture evidence that did not exist. As to Rodriguez's Eighth Amendment claim, defendants contend that any delay in medical treatment does not rise to the level of a constitutional violation because it did not cause further injury to Rodriguez. Finally, defendants assert that Rodriguez's First Amendment claim fails because he does not allege any reason for Jost's alleged retaliation. (*Id.* at 4-9.)

The court agrees with defendants that Rodriguez's allegations are insufficient to state either a Fourteenth Amendment claim against Hansen and Main or an Eighth Amendment claim against Hansen, and therefore grants defendants' motions as to those claims. As to Rodriguez's Fourteenth Amendment claim against Serrano and his First Amendment claim against Jost, however, Rodriguez's allegations are sufficient and defendants have failed to show that there is

no genuine dispute of material fact. The court therefore denies defendants' motion as to those claims.[1]

## BACKGROUND

When considering a motion for summary judgment, the court must "assume the truth of the evidence set forth by the nonmoving party." *Furnace v. Sullivan*, 705 F.3d 1021, 1026 (9th Cir. 2013). Further, a "plaintiff's verified complaint may be considered as an affidavit in opposition to summary judgment if it is based on personal knowledge and it sets forth specific facts admissible in evidence." *Lopez v. Smith*, 203 F.3d 1122, 1132 n.14 (9th Cir. 2000). Rodriguez's Complaint is verified: it contains a sworn statement declaring, under penalty of perjury, that the allegations therein are true and correct in accordance with 28 U.S.C. § 1746. (Compl. at 28.) Accordingly, the court recites the facts as alleged in Rodriguez's Complaint.

At the time of the events underlying his claims, Rodriguez was an adult in the custody of the Oregon Department of Corrections (ODOC). On the afternoon of November 20, 2018, he met with an Oregon State Police detective to discuss criminal activity that occurred while he was housed in Pendleton, Oregon. (*Id*. ¶¶ 16, 19.) Special housing officers Kautz and Hansen escorted Rodriguez to the conference room where the meeting took place. (*Id*. ¶ 17.) The meeting was brief: the detective read Rodriguez his *Miranda* rights, Rodriguez denied understanding those rights, and the detective said he would not talk to Rodriguez until he waived his rights, ending the meeting. (*Id*. ¶ 20.)

As Kautz and Hansen were escorting Rodriguez out of the room, the detective made a

---

[1]    The parties have consented to jurisdiction by magistrate judge as permitted by 28 U.S.C. § 636(c)(1). (Full Consent, ECF No. 43.)

snide remark about Rodriguez wasting his time. The remark offended Rodriguez, who turned

back toward the detective to reply. Kautz pulled Rodriguez's shirt sleeve and warned him to keep

his head facing forward. (*Id.* ¶¶ 21-22.) Rodriguez told Kautz that it had nothing to do with him.

Kautz turned Rodriguez toward him and said "You know what your problem is? You don't

listen!" Rodriguez again told Kautz that it didn't involve him. (*Id.* ¶ 24.) Kautz said "You know

what!", grabbed Rodriguez by the back of the neck, and threw him face-first into the wall. (*Id.*

¶ 25.) Kautz and Hansen pulled Rodriguez back, shoved his face into a steel doorframe, and then

tackled him to the ground.

Around this time, a response team arrived with a camera. Multiple staff then beat

Rodriguez while he was on the ground, yelling at him to "stop resisting!" Rodriguez replied

"What the fuck! I didn't do anything! I'm in handcuffs and leg restraints, I can't move, I'm not

resisting!" (*Id.* ¶ 28.)

After several minutes, staff lifted Rodriguez to his feet. (*Id.* ¶ 31.) They walked him

about five steps before an officer tripped him. (*Id.* ¶¶ 32-33.) Rodriguez fell to the ground and

several officers piled on top of him. Rodriguez began to yell to a nurse nearby: "Help! Help me!

Nurse I can't breathe!" (*Id.* ¶ 37.) Someone commented that if Rodriguez couldn't breathe, he

wouldn't be talking. (*Id.* ¶ 38.) Throughout the encounter, Rodriguez was restrained by

handcuffs, leg irons, and a tether. (*Id.* ¶¶ 17, 23, 33.)

Staff then put Rodriguez in a holding cell for about three hours. (*Id.* ¶¶ 42, 51-52.) When

Rodriguez returned to his cell that evening, he found that all of his personal property was gone.

(*Id.* ¶ 53.) He could also see that someone had tampered with his food. (*Id.* ¶ 54.)

Around 6:30 or 7:00 that evening, a nurse came through Rodriguez's housing unit. Upon

seeing Rodriguez's injuries, including a large bump above his right eye and that his eye was nearly swollen shut, the nurse gave him ice and instructed him to take ibuprofen. (*Id.* ¶¶ 55-56.) Rodriguez told the nurse that he didn't have any ibuprofen; his personal belongings had been taken. The nurse then told Hansen, who was standing nearby, that there was no ibuprofen on the medcart. Hansen replied that Rodriguez could get ibuprofen from the supply cart the next day at 2:00 p.m. (*Id.* ¶ 55.)

Rodriguez was later charged with two rules violations, Disrespect I and Disobedience of an Order I, for alleged misbehavior while he was being escorted out of the November 20 meeting. (Compl. ¶¶ 56, 59.) Rodriguez had a disciplinary hearing on those charges on November 28, over which defendant Serrano presided. (*Id.* ¶ 58.) At the hearing, Rodriguez denied the charges against him, disputed Kautz and Hansen's version of events, and asked Serrano to review video footage from before and after his alleged misconduct. (*Id.* ¶¶ 61-62.) Serrano declined to review those videos, explaining that events occurring before and after Rodriguez's alleged misconduct were not relevant to determining whether Rodriguez committed the violations. Serrano concluded that Rodriguez had committed the charged rule violations and sanctioned Rodriguez with a $50 fine and 28 days loss of privileges. (*Id.* ¶ 63; ODOC Loss of Privileges Sanction Order, ECF No. 2-2.)

In late November and early December, Rodriguez filed grievances against multiple officers for their conduct on November 20. He grieved their use of force, removal of his property, tampering with his food, and delay of medical treatment. (*See* Compl. Exs. 8a-11.) On December 7, Rodriguez learned from another inmate that defendant Jost had called him a "rat" and told other inmates that Rodriguez was "dropping kytes and getting everyone down here in

trouble." (*Id.* ¶ 90.)

## SUMMARY JUDGMENT STANDARDS

A moving party without the ultimate burden of persuasion at trial—
usually, but not always, a defendant—has both the initial burden of production
and the ultimate burden of persuasion on a motion for summary judgment. In
order to carry its burden of production, the moving party must either produce
evidence negating an essential element of the nonmoving party's claim or defense
or show that the nonmoving party does not have enough evidence of an essential
element to carry its ultimate burden of persuasion at trial. In order to carry its
ultimate burden of persuasion on the motion, the moving party must persuade the
court that there is no genuine issue of material fact.

If a moving party fails to carry its initial burden of production, the
nonmoving party has no obligation to produce anything, even if the nonmoving
party would have the ultimate burden of persuasion at trial. In such a case, the
nonmoving party may defeat the motion for summary judgment without
producing anything. If, however, a moving party carries its burden of production,
the nonmoving party must produce evidence to support its claim or defense. If the
nonmoving party fails to produce enough evidence to create a genuine issue of
material fact, the moving party wins the motion for summary judgment.

*Nissan Fire & Marine Ins. v. Fritz Companies*, 210 F.3d 1099, 1102-03 (9th Cir. 2000) (citations

omitted).

When reviewing a motion for summary judgment, the court views the evidence in the

light most favorable to the nonmoving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d

1278, 1284 (9th Cir. 1982); *see also Lew v. Kona Hosp.*, 754 F.2d 1420, 1423 (9th Cir. 1985)

("[A]s a general principal we treat the opposing party's papers more indulgently than the moving

party's papers."). All reasonable doubt as to the existence of a genuine issue of fact should thus

be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976).

Further, the court must "construe liberally motion papers and pleadings filed by *pro se*

inmates and should avoid applying summary judgment rules strictly." *Thomas v. Ponder*, 611

F.3d 1144, 1150 (9th Cir. 2010). That rule exempts self-represented adults in custody (AICs)

Page 6 – OPINION AND ORDER

from strict compliance with summary judgment rules, but does not exempt them from all compliance. *Soto v. Sweetman*, 882 F.3d 865, 872 (9th Cir. 2018); *accord Blaisdell v. Frappiea*, 729 F.3d 1237, 1241 (9th Cir. 2013) ("This rule relieves *pro se* litigants from the strict application of procedural rules and demands that a court not hold missing or inaccurate legal terminology or muddled draftsmanship against them.").

## DISCUSSION

**A.    *Fourteenth Amendment Due Process Claims***

### 1.    Fourteenth Amendment Claim against Hansen and Main

"[T]hough his rights may be diminished by the needs and exigencies of the institutional environment, a prisoner is not wholly stripped of constitutional protections when he is imprisoned for crime." *Wolff v. McDonnell*, 418 U.S. 539, 555 (1974). Like other individuals, AICs "may also claim the protections of the Due Process Clause. They may not be deprived of life, liberty, or property without due process of law." *Id.* at 556.

Rodriguez alleges that Hansen and Main violated his Fourteenth Amendment right to due process by removing property from his cell without justification and denying him access to that property. (Compl. ¶¶ 103-04.) He alleges that the officers did so in violation of ODOC policy, for the purpose of harassing and humiliating him. (Pl.'s Resp. at 6, ECF No. 101.) Defendants respond that, even if Hansen and Main did remove Rodriguez's property from his cell without good reason, Rodriguez's right to due process was not violated because predeprivation process was not practicable and the state provides an adequate postdeprivation remedy. (*See* Defs.' Mot. at 4.)

#### a.    Whether predeprivation process was "practicable"

The Supreme Court has held, in *Parratt v. Taylor*, 451 U.S. 527 (1981),[2] the that the Due Process Clause of the Fourteenth Amendment is not violated when a state employee negligently deprives an individual of property, provided that the state makes available a meaningful postdeprivation remedy. 451 U.S. at 543-44. "The underlying rationale of *Parratt* is that when deprivations of property are effected through random and unauthorized conduct of a state employee, predeprivation procedures are simply 'impracticable' since the state cannot know when such deprivations will occur." *Hudson v. Palmer*, 468 U.S. 517, 533 (1984). The Court later extended *Parratt*'s holding to intentional deprivations of property because "it would be absurd to suggest that the State hold a hearing to determine whether a guard should" deprive an inmate of his property in violation of the state's policies. *Zinermon v. Burch*, 494 U.S. 113, 137 (1990) (citing *Hudson*, 468 U.S. at 533-34). "The state can no more anticipate and control in advance the random and unauthorized intentional conduct of its employees than it can anticipate similar negligent conduct." *Hudson*, 468 U.S. at 533. Accordingly, when a state employee intentionally deprives an AIC of property, "the state's action is not complete until and unless it provides or refuses to provide a suitable postdeprivation remedy." *Id*.

The reasoning of *Parratt* applies only to situations where "the state administrative machinery did not and could not have learned of the deprivation until after it had occurred." *Piatt v. MacDougall,* 773 F.2d 1032, 1036 (9th Cir.1985) (en banc). If an injury was "sufficiently predictable to make a predeprivation remedy practicable," then predeprivation process is required. *Merritt v. Mackey*, 827 F.2d 1368, 1372 (9th Cir. 1987).

---

[2]       Overruled in part not relevant here by *Daniels v. Williams*, 474 U.S. 327 (1986).

According to Rodriguez, Hansen and Main's actions were unauthorized: they violated ODOC policy when they removed property from his cell to humiliate and harass him. (Pl.'s Resp. at 6.) They did so during the three-and-a-half-hour window that Rodriguez was outside his cell. (*See* Compl. ¶ 17 (Officers came to escort Rodriguez from cell around 1:50 p.m.); *id.* ¶ 52 (Rodriguez returned to his cell around 5:20 p.m.).) Three and a half hours between the initial incident (the use of force) and their subsequent removal of Rodriguez's property is too short a period for the removal to have been "planned or prescribed" in such a way that "the state administrative machinery" could have learned of the deprivation before it occurred. *Piatt*, 773 F.2d at 1036. There is no evidence suggesting, nor does Rodriguez allege, that the state could have anticipated the officers' actions. Accordingly, the state could not feasibly have provided predeprivation process.

    **b.**  **Whether there was an adequate postdeprivation remedy available**

Having determined that predeprivation process was not feasible, the court must determine whether Oregon provided Rodriguez a postdeprivation remedy that satisfies the requirements of procedural due process. *Hudson*, 468 U.S. at 534. A postdeprivation remedy may be adequate even if it does not provide relief identical to that available under 42 U.S.C. § 1983. *Id.* at 535; *Lake Nacimiento Ranch Co. v. County of San Luis Obispo*, 841 F.2d 872, 879 (9th Cir. 1988) (citing *Parratt*, 451 U.S. at 543-44). The existence of adequate postdeprivation process is assessed at the time of the deprivation. *See Parratt*, 451 U.S. at 543 (holding that this requirement was met where the state's tort claims procedure "was in existence at the time of the loss here in question but [claimant] did not use it").

Page 9 – OPINION AND ORDER

Defendants assert that the Oregon Tort Claims Act (OTCA), ORS § 30.260 *et seq.*, supplied an adequate postdeprivation remedy. The OTCA authorizes civil actions against public bodies like ODOC for torts of employees acting within the scope of their employment. ORS § 30.265. Other courts in this district have concluded that the OTCA is an adequate post-deprivation remedy for claims of unauthorized, intentional deprivations of property. *Osborne v. Williams*, Case No. CV 09-1420-PA, 2010 WL 11537608, at *1 (D. Or. Jan. 12, 2010) (concluding that the OTCA was an adequate remedy for AIC's claims that prison employees lost some of his property and replaced his broken television set with a used television set), *aff'd*, 444 F. App'x 153, 154-55 (9th Cir. 2011); *Patton v. Thomas*, Case No. CV. 10-1333-MO, 2011 WL 837149, at *2 (D. Or. Mar. 3, 2011) (concluding that OTCA provides an adequate postdeprivation remedy for AIC's claim that defendant confiscated his legal mail and failed to return it). Rodriguez does not dispute that the OTCA provided an adequate postdeprivation remedy.[3] (*See* Pl.'s Resp. at 5-8.) The court therefore concludes that the state provided an adequate postdeprivation remedy for Rodriguez's claim that Hansen and Main removed property from his cell.

 In Rodriguez's view, the availability of a remedy under the Oregon Tort Claims Act does not absolve defendants of their violation of his due process rights. (*Id*. at 6.) But because the OTCA provides an adequate remedy, Rodriguez's right to due process wasn't violated at all: the

---

[3]    Rodriguez does assert that he filed a tort claim notice, which the state denied. (Pl.'s Resp. at 8 (citing Exs. 20A-D).) Following the state's denial, Rodriguez was entitled to file a legal action under the OTCA for the removal of his property. *See* ORS §§ 30.265, 30.275; (Ex. 20A ("If you choose to pursue your claim, the Department of Corrections is prepared to proceed to litigation.)). The state's initial denial does not render the OTCA an inadequate postdeprivation remedy.

postdeprivation remedy *is* the due process. *See, e.g.*, *Raditch v. United States*, 929 F.2d 478, 480 (9th Cir. 1991) ("[B]ecause the deprivation of [plaintiff's property interest] resulted from the unauthorized act of a government official in violation of the [agency's] procedures, and adequate postdeprivation remedies for the violation exist, [plaintiff] received all the process that was due."). The court therefore grants defendants summary judgment on Rodriguez's Fourteenth Amendment claim against Hansen and Main.

### 2.    Fourteenth Amendment Claim against Serrano

Due Process Clause protections attach to prison disciplinary proceedings when a constitutionally protected liberty or property interest is at stake.[4] *Wolff v. McDonell*, 418 U.S. 539, 556 (1974). Because prison disciplinary proceedings are not part of a criminal prosecution, however, "the full panoply of rights due a [criminal defendant] does not apply." *Id*. Instead, "there must be mutual accommodation" between Constitutional guarantees of adequate process and prisons' institutional needs. *Id.*

"[An AIC] facing disciplinary proceedings should be allowed to present documentary evidence in his defense when permitting him to do so would not be unduly hazardous to institutional safety or correctional goals." *Melnik v. Dzurenda*, 14 F.4th 981, 985 (9th Cir. 2021) (quoting *Wolff*, 418 U.S. at 566). Although "prison officials must have the necessary discretion to keep the hearing within reasonable limits," *Wolff*, 418 U.S. at 566, any limitations on an AIC's

---

[4]    Defendants do not dispute that there was a constitutionally protected liberty or property interest at stake in Rodriguez's disciplinary hearing, nor does either party brief the issue. Accordingly, the court assumes that there was a constitutionally protected liberty or property interest at stake during the disciplinary hearing and that the protections of due process therefore attached.

efforts to defend himself must be justified by "a legitimate penological reason." *Koenig v. Vannelli*, 971 F.2d 422, 423 (9th Cir. 1992).

The justification for limiting an AIC's ability to present evidence must be legitimate, "not merely pretense or pretext." *Melnik*, 14 F.4th at 987. And the denial of an AIC's request to present evidence must not be arbitrary "as 'the touchstone of due process is protection of the individual against arbitrary action of government.'" *Id.* (quoting *Wolff*, 418 U.S. at 558). Administrative efficiency, for example, "is not an adequate justification." *Melnik*, 14 F.4th at 987.

Rodriguez alleges that Serrano violated his right to due process during the disciplinary hearing by refusing to consider video footage as Rodriguez requested. Serrano explained during the disciplinary hearing that he did not think the video footage would be helpful because he could not consider what happened before or after the alleged misconduct. (Hearing at 7:20-8:25.) Rodriguez responded that he thought the videos would help demonstrate why, in his view, Kautz and Hansen's reports didn't make sense. That is, he argued that the video would undermine the credibility of Hansen and Kautz, because it would show that their description of what happened before and after Rodriguez's alleged violations was untrue. (*See, e.g.*, *id.* at 8:22-8:30 (explaining that there was a camera recording at the time of some of the events alleged in the report); *id.* at 14:19 ("[T]he reports don't make any sense."); *id.* at 17:10-17:25 ("There was no disrespect or disobedience, period . . . . That's why I asked for the cameras.").)

Defendants offer two reasons why they are entitled to summary judgment on this claim. *First*, they assert that the requested videos did not exist. (Defs.' Mot. at 9.) That argument misconstrues Rodriguez's request and the allegations in his Complaint. During the hearing,

Rodriguez asked whether there was a camera covering the conference room and the corridor where his misconduct allegedly took place. (Hearing at 6:45-6:58.) Serrano explained that there was no camera there as that was an "administration area." (*Id.* at 7:02-7:10.) Rodriguez accepted that explanation. He then asked Serrano to review video from a handheld camera that arrived with the response team after Rodriguez was already on the ground, as well as video from the special housing unit corridor. (Hearing at 7:15-7:24, 7:33-8:16, 15:26-15:50, 17:26-17:30.) In his Complaint, it is video from the handheld camera and the housing corridor that he argues Serrano should have reviewed. (Compl. ¶ 62 ("The hearings officer declined to pull the footage stating 'he wasn't concerned with what happened before or after the event only what caused it.'"); *see also id.* ¶ 34.) Defendants do not dispute the existence of video from the response team's handheld camera and the special housing unit corridor. (*See id.*; Serrano Decl. ¶ 7.)

*Second*, defendants point to Serrano's declaration "that he reviewed all the relevant videos of the incident involving [Rodriguez] and used that information to form his decision during [Rodriguez]'s disciplinary hearing." (Defs.' Mot. at 9 (citing Serrano Decl. ¶ 6).) As Rodriguez points out, however, to the extent defendants contend that Serrano *did* review the requested footage and consider it in his deliberation, their contention is contradicted by Serrano's statements during the hearing. (Pl.'s Resp. at 12-13; Hearing at 7:25-8:30.) Accordingly, there is a genuine issue of material fact as to that issue. To the extent that defendants instead rely on the reasons Serrano gave during the hearing (*see* Defs.' Mot. at 9 (stating "all this was explained to Plaintiff during his disciplinary hearing")), Rodriguez argues that those reasons are inadequate. (Pl.'s Resp. at 13.)

At the hearing, Serrano stated that he would not review the requested video because he was "only considering what's in the misconduct report." (Hearing at 7:43-7:46.) He explained that he could not make a decision based on what happened after the fact "because they don't provide me that information" and because "I can't consider what's after the fact if its not in the body of the report." (*Id.* at 7:5-7:56, 8:21-8:24.) Rodriguez argued that Serrano's reasoning should not prevent him from reviewing the videos: Rodriguez pointed out that the misconduct report included the officers' account of events after the response team arrived with a camera and that he disputed the officers' version of those events. (*Id.* at 8:14, 8:26-8:33.). Serrano continued to emphasize that anything that occurred after the alleged misconduct was irrelevant because "as far as the hearings process goes, it's simply about [the officers'] perception and their report." (*Id*. at 15:16.)

In Rodriguez's view, had Serrano checked the video, he could have determined whose versions of the events before and after Rodriguez's alleged misconduct was true. (*See* Pl.'s Resp. at 13.) That knowledge would have been relevant to determining whose account regarding the alleged misconduct was more credible. Given that the only evidence against Rodriguez was the officers' reports, discrediting those reports would have gone a long way toward mounting a defense.

Accordingly, the reasons provided during the hearing for declining to consider the videos—that Serrano could only consider facts from the report and that the hearings process is "simply about [the officers'] perception and their report"—do not logically justify his refusal to consider evidence that might have contradicted portions of that report. *Cf. Melnik*, 14 F.4th at 987 (There must be a logical foundation for the reason provided for denying an AIC's request to

access evidence.). And defendants do not offer any other justification for the denial. (*See* Defs.'
Mot. at 9.) Because defendants have failed to offer any legitimate reason for refusing to consider
the videos in Rodriguez's disciplinary hearing, they have not demonstrated that Rodriguez's
claim fails as a matter of law. The court therefore denies their motion for summary judgment as
to Rodriguez's Fourteenth Amendment claim against Serrano.[5]

## B.    *Eighth Amendment Claim Against Hansen*

Adults in custody have an Eighth Amendment right to be free from cruel and unusual
punishment, which includes a right to adequate medical treatment. *Sandoval v. County of San
Diego*, 985 F.3d 657, 667 (9th Cir. 2021). Prison officials violate that right "if they are
deliberately indifferent to a prisoner's serious medical needs." *Peralta v. Dillard*, 744 F.3d 1076,
1081 (9th Cir. 2014) (en banc) (quotation marks omitted). "A medical need is serious if failure to
treat it will result in significant injury or the unnecessary and wonton infliction of pain." *Id.*
(quotation marks omitted).

"[P]rison officials violate the Constitution when they deny, delay or intentionally
interfere with needed medical treatment." *Sandoval*, 985 F.3d at 679 (quotation marks omitted).
Where an AIC alleges that delay of medical treatment amounts to deliberate indifference,
however, he must show that the delay caused him "substantial harm." *Wood v. Housewright*, 900

---

[5]    Defendants further ask for summary judgment on what they interpret as Rodriguez's
Fourteenth Amendment claim against Serrano for failure to investigate. (Defs.' Mot. at 9.) The
court does not understand Rodriguez's Complaint to allege that due process required that Serrano
perform any additional investigation aside from reviewing and considering the video. (*See*
Compl. ¶¶ 62, 106.) Nor does Rodriguez argue in his Response that Serrano should have
performed further investigation besides reviewing the requested video. (*See* Pl.'s Resp. at 12-14
(arguing that it was a due process violation to refuse to consider the video, but not that Serrano
was required to conduct any additional investigation).) Defendants' motion for summary
judgment on this issue is therefore unnecessary.

F.2d 1332, 1335 (9th Cir. 1990); *see also Shapley v. Nevada Bd. of State Prison Comm'rs.*, 766

F.2d 404, 407 (9th Cir. 1985) (explaining that delay of needed surgery is not an Eighth

Amendment violation unless the delay is harmful).

Defendants concede that the injuries Rodriguez sustained on November 20 created a

"serious medical need." (Defs.' Mot. at 5.) Even so, and even accepting Rodriguez's version of

events (which they dispute), defendants argue that Rodriguez's Eighth Amendment claim fails

because he does not allege that the delay in receiving ibuprofen caused him further injury. (*Id.* at

6.) Rodriguez responds that, given the severity of the injury to his head and face, which included

a black eye that lasted 41 days, it is obvious that any delay in providing him with a painkiller was

a wanton infliction of pain. (Pl.'s Resp. at 10.) That is, he argues that the delay caused him

further injury in the form of severe and unnecessary pain.

The Ninth Circuit, however, has indicated that more is required to show that a delay in

treatment caused "substantial harm." For example, in *Wood v. Housewright*, 900 F.2d 1332 (9th

Cir. 1990), the Ninth Circuit said that a delay of several days in treatment for a broken pin in the

plaintiff's shoulder was not an Eighth Amendment violation, because the plaintiff's condition

"did not require emergency attention" and "the delay [did not] substantially harm [plaintiff]'s

treatment, considering that the only remedy immediately available was a prescription for

painkillers." 900 F.2d at 1335. In contrast, the Ninth Circuit held that the plaintiff sufficiently

alleged substantial harm caused by delay in *Hunt v. Dental Department*, 865 F.2d 198 (9th Cir.

1989), where prison officials delayed an inmate's dental treatment for nearly three months, and

denied his request to be switched to a soft foods diet, despite the inmate's claim that "without his

dentures, his teeth were breaking off and his gums were bleeding and had become infected" and that "he suffered pain and weight loss due to his inability to eat properly." 865 F.2d at 199.

Here, Rodriguez alleges that Hansen delayed providing him ibuprofen for 19 hours. He points out that, had he received ibuprofen sooner, it would have reduced the pain and swelling from his head injury. (Pl.'s Resp. at 8-9.) The court recognizes that, accepting his version of events, Rodriguez suffered additional and unnecessary pain because of the delay in receiving ibuprofen. Under Ninth Circuit case law, however, a 19-hour delay in receiving an over-the-counter painkiller is not "substantial harm." *Wood*, 900 F.2d at 1335; *see also Alston v. County of Sacramento*, Case No. 2:18-cv-01041-TLN-CKD, 2018 WL 3093519, at *4 (E.D. Cal. June 22, 2018) (holding that plaintiff did not allege an Eighth Amendment violation where defendants failed to provide him ibuprofen for 10 hours, explaining that "[t]he extent of plaintiff's injury— less than one day without an over-the-counter painkiller—simply does not constitute cruel and unusual punishment"). Despite the seriousness of Rodriguez's injury, the alleged delay in treatment does not rise to the level of a constitutional violation. The court therefore grants summary judgment to defendants on Rodriguez's Eighth Amendment claim.

## C.    *First Amendment Retaliation Claim against Jost*

"The most fundamental of the constitutional protections that prisoners retain are the First Amendment rights to file prison grievances and to pursue civil rights litigation in the courts[.]" *Entler v. Gregoire*, 872 F.3d 1031, 1039 (9th Cir. 2017) (footnotes omitted). "Retaliation against prisoners for their exercise of th[ose] right[s] is itself a constitutional violation, and prohibited as a matter of 'clearly established law.'" *Brodheim v. Cry*, 584 F.3d 1262, 1269 (9th Cir. 2009)

(citing *Rhodes v. Robinson*, 408 F.3d 559, 567 (9th Cir. 2005), and *Pratt v. Rowland*, 65 F.3d 802, 806 & n.4 (9th Cir. 1995)).

> There are five elements for a claim of First Amendment retaliation in the prison context:
>
> (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal.

*Brodheim*, 584 F.3d at 1269 (quoting *Rhodes*, 408 F.3d at 567-68).

According to defendants, Rodriguez's First Amendment claim fails because he does not allege that Jost's motive for calling Rodriguez a "rat" was Rodriguez's filing of grievances. (Defs.' Mot. at 7.) Defendants point to paragraphs 90 and 92 of Rodriguez's Complaint, where Rodriguez alleges that Jost retaliated against him by calling him a "rat." (*Id.*)

It is true that Rodriguez does not allege a reason for Jost's retaliation in the portions of his Complaint that defendants highlight. Both of those paragraphs, however, explicitly reference attached Exhibit 13. (Compl. ¶ 90 ("See attached: Exhibit #13"); ¶ 92 (same).) Exhibit 13 consists of grievance forms that Rodriguez submitted and "Return of Grievance" forms that he received in response, labelled 13a through 13f. Exhibit 13a is a grievance form that Rodriguez submitted on December 12, 2018. In it, Rodriguez states that "Captain Jost is slandering my name with false allegations calling me a rat for grieving the excessive force/denial of due process/harassment/retribution campaign," and that "[i]f 10 staff jump me and I grieve it I'm a rat." (ECF No. 2 at 71.) And in exhibit 13d, a grievance form submitted on December 20, Rodriguez states: "Captain Jost called me a [r]at and is spreading rumors I'm a rat. It's not true, it's unprofessional, it's defamation of my character, it puts me at future risk of harm by other

inmates, and it's retaliation against me exercising my First Amendment right to redress my grievances." (*Id.* at 74.)

In light of Rodriguez's clear and repeated allegations—in the exhibits attached to his Complaint—that Jost called him a "rat" because he filed grievances, the court cannot agree with defendants that Rodriguez has failed to allege the motivating factor behind Jost's statements. Other evidence in the record also supports Rodriguez's theory of Jost's motive. Another AIC, for example, stated that he saw "a number of officers visit[] AIC rodriguez's cell telling him to stop writing grievances and he'll never win his lawsuit." (Fanus Decl. at 2, ECF No. 74.)

Defendants argue that, "[i]n any event," the court should grant summary judgment on Rodriguez's First Amendment claim because "Defendant Jost states that he has never told another inmate, nor would he ever tell another inmate that Plaintiff was telling on other inmates and getting them in trouble and that he was a 'rat.'" (Defs.' Mot. at 7 (citing Jost Decl. ¶ 5, ECF No. 92).) Given the other evidence in the record, such as Rodriguez's allegations that AIC Jacobs said Jost called Rodriguez a "rat" (Compl. ¶ 90) and that Rodriguez's informant knew of his grievances even though Rodriguez had not told other inmates about his grievances (*Id.* Ex. 13a), Jost's declaration does not establish that there is no genuine issue of fact as to whether he called Rodriguez a "rat."

Defendants have failed to meet their burden of production by either "negating an essential element" of Rodriguez's First Amendment claim or "show[ing] that [Rodriguez] does not have enough evidence of an essential element to carry [his] ultimate burden of persuasion at trial." *Nissan Fire*, 210 F.3d at 1102. Accordingly, Rodriguez is not required to provide any additional evidence to defeat defendants' motion for summary judgment as to his First

Amendment claim. *See id.* at 1102-03 ("If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial. In such a case, the nonmoving party may defeat the motion for summary judgment without producing anything." (citations omitted)). The court therefore denies defendants' motion for summary judgment as to Rodriguez's First Amendment claim.

## CONCLUSION

For the above reasons, defendants' Supplemental Motion for Summary Judgment (ECF No. 90) is GRANTED IN PART and DENIED IN PART.

DATED: March 8, 2024

_____
JEFF ARMISTEAD
United States Magistrate Judge

Page 20 – OPINION AND ORDER